Funk et al. v. Staats.

THIS was an action on the case, tried in the Circuit Court of Winnebago county, before SHELDON, Judge, and a jury, and verdict and judgment against appellant for $255. The defects in the declaration for which the case is reversed, are stated in the opinion.

J. L. LOOP, for Appellant.

A. S. MILLER, for Appellee.

HENRY FUNK et al., Appellants, v. JOHN STAATS, Appellee.

APPEAL FROM THE SUPERIOR COURT OF CHICAGO.

When several partners or joint owners have acknowleged a chattel mortgage, in the justice's district in which one of them resides, and in which the property is situated, such an acknowledgment is sufficient.

The objection to a chattel mortgage, that no memorandum was made on the justice's docket, must be urged in the court below, or it will not be considered in this court.

Funk et al. *v.* Staats.

A debtor has the right to prefer creditors in payment or security, and where a creditor takes a mortgage, in good faith, to secure his debt, the motives of the mortgagor in giving it, do not affect the transaction.

To permit the mortgaged chattel to remain in the possession of the mortgagor, contrary to the terms of the deed, is fraudulent *per se,* and admits of no explanation.

A delivery and possession, which would be sufficient to operate against creditors and purchasers, on a sale of chattels, is sufficient on the foreclosure of a chattel mortgage.

When mortgaged chattels have been reduced to possession, after default, and the title has become absolute in the mortgagee, he may then loan it to the mortgagor, to use it for the owner's benefit, precisely as he might any of his other property, and these facts may be proved by any satisfactory evidence.

The mortgaged property need not in all cases be removed from the premises of the mortgagor, particularly when it is so heavy that its removal would be difficult and expensive. If the mortgagor takes and keeps it under his own control, or that of his agent, it is sufficient.

THIS was an action of trover, by appellee against appellants, for one steam engine and boiler, and the fixtures and appurtenances thereto belonging.

The declaration alleged the conversion on the 20th of April, 1859.

The defendants severally pleaded the general issue, which was joined.

The cause was submitted to the court, J. M. WILSON, Judge, without the intervention of a jury, and, after a hearing, the court found the defendants guilty, and assessed the damages at the sum of sixteen hundred and fifty dollars. Thereupon the defendants submitted a motion for a new trial, which was overruled by the court, and judgment rendered for said sum, etc., and the defendants appealed.

On the trial, the plaintiff introduced the following mortgage:

"This Indenture, made and entered into this twenty-first day of March, in the year of our Lord one thousand eight hundred and fifty-seven, between John F. Temple and Robert M. Wright, of the county of Cook and State of Illinois, party of the first part, and John Staats, of Oswego, New York, party of the second part, Witnesseth: That the said parties of the first part, for and in consideration of the sum of two thousand and seventy-seven and $\frac{44}{100}$ dollars, in hand paid, the receipt whereof is hereby acknowledged, do hereby grant, sell, convey and confirm unto the said party of the second part, his heirs and assigns, forever, all and singular the following described goods and chattels, to wit: The steam engine, boiler and fixtures, and appurtenances thereunto belonging, now owned and possessed by the said parties of the first part, and situated in the planing mill now occupied and used by said parties of the first part, on the corner of Polk and Canal streets, in the city of Chicago, said engine, boiler and fixtures, and appurtances, now being

used to propel the planing and matching machines used in said mill, together with all and singular the appurtenances thereunto belonging or in anywise appertaining, to have and to hold the above described goods and chattels unto the said party of the second part, his heirs and assigns, forever.

" Provided always, and these presents are upon this express condition, that if the said John F. Temple and Robert M. Wright, their heirs, executors, administrators or assigns, shall, on or before the twenty-first day of March, A. D. eighteen hundred and fifty nine, pay or cause to be paid to the said John Staats, or his lawful attorney or attorneys, heirs, executors, administrators or assigns, the sum of two thousand and seventy-seven and $\frac{44}{100}$ dollars, together with the interest that may accrue thereon, at the rate of seven per centum per annum, from the twenty-first day of March, A. D. eighteen hundred and fifty-seven, until paid, according to the tenor of a certain promissory note bearing even date herewith, made by said parties of the first part to said party of the second part, given in consideration of lumber sold by said party of the second part to said parties of the first part, that then, and from thenceforth, these presents, and everything herein contained, shall cease, and be null and void, anything herein contained to the contrary notwithstanding.

" Provided, also, that the said John F. Temple and Robert M. Wright are to retain possession of and have the use of said goods and chattels until the day of payment aforesaid, and also at their own expense to keep said goods and chattels, and also at the expiration of the said time of payment, if said sum of money, together with the interest as aforesaid, shall not be paid, to deliver up said goods and chattels, in good condition, to said John Staats, or his heirs, executors, administrators, assigns ; and provided also, that if default in payment, as aforesaid, shall be made, that then the said John Staats, or his attorney, agent, or assigns, or heirs, executors or administrators, shall have the right to take possession of said goods and chattels, wherever the same may or can be found, and sell the same at public or private sale to the highest bidder for cash in hand, after giving ten days' notice of the time, place and terms of said sale, together with a description of the goods and chattels to be sold, by at least three advertisements, posted up in public places in the vicinity where said sale is to take place, to make the sum of money and interest promised as aforesaid, together with his reasonable costs, charges and expenses in so doing ; and if there shall be any overplus, shall pay the same to the said John F. Temple and Robert M. Wright, or their legal representatives.

" In testimony whereof, the said parties of the first part have hereunto set their hands and affixed their seals the day and year first herein written.

JOHN F. TEMPLE. [L. S.]

" Signed, sealed and delivered  ROBERT M. WRIGHT. [L. S.]
in presence of
GEO. W. HALL.

STATE OF ILLINOIS, ⎰ ss.
COOK COUNTY.  ⎱  I, H. B. Ruger, a justice of the peace in and for said county, do hereby certify that this mortgage was duly acknowledged before me by the above named John F. Temple and Robert M. Wright, this 23rd day of March, A. D. 1857.  H. B. RUGER, J. P. [L. S.]

STATE OF ILLINOIS, ⎰
COOK COUNTY.  ⎱
Filed for record 24th March, 1857, and recorded in Book 7 of Chattel Mortgages, page 21.  WM. L. CHURCH, Clerk.

The signatures were admitted by the defendants, but the defendant objected to the admission, as evidence, of the said chattel mortgage without proof that it was properly and duly acknowledged in the justice's district in which each of the mortgagors respectively resided, and that the same was duly recorded in the office of the recorder of the county in which said mortgagors resided.

The plaintiff then called *Robert M. Wright* as a witness, who testified : I am one of the mortgagors in the mortgage produced. At the time the mortgage was executed, and on the twenty-third day of March, 1857, I resided in the town of West Chicago.  The firm was in the planing and sawing business. The other party was John F. Temple.  The origin of the indebtedness secured by mortgage, was lumber bought of plaintiff.  We leased the land and owned the fixtures, the building and machinery situated in West Chicago.  John F. Temple resided in South Chicago.  Our business was carried on in the place mentioned in the mortgage.  Plaintiff was not present when mortgage was executed.  George W. Hall, who witnessed the mortgage, represented him.  Before the mortgage expired—I think in April, soon after the mortgage was given— I saw plaintiff.  All the objection that plaintiff made, was that it was subject to Funk's mortgage.  I took plaintiff's mortgage, and two others, to the recorder's office.  I do not know what became of the note.  On the twenty-second of March, 1859, Barent Staats, of Milwaukee, came, as the agent of the plaintiff, and demanded possession of the engine and boilers.  I gave him possession of them. , They disconnected the keys and gibs of the main valve, and Barent Staats put Philander H. Baldwin in possession, who, in the day time, was in the mill and kept these keys when the engine was not running ; when we were

running it, he put them in place, and took them out when we were through. These keys were indispensable to run the engine. Baldwin remained on the premises some three or four weeks, may be more. The note or debt for which it was given has not been paid. They were run pretty much all the time, perhaps three-quarters of the time ten hours per day since that time : heated with shavings. At the time Baldwin was put in possession, it was in good running order ; we were using it all the time, as we wanted to ; we run the engine with Baldwin's permission ; when we wanted to run, he furnished us the keys and gibs to run with.

I am acquainted with defendant Funk. He was in Chicago when plaintiff's agent took possession, and he told me he knew that fact the day after plaintiff had taken possession, when about seven or eight o'clock in the morning I came to Temple and Wright's office. Defendant Funk was there. I went into the mill. Funk followed me. He told me he had come to take possession of the property mortgaged to him ; that as plaintiff had taken possession, he thought he had the same right ; and it was not his intention to prevent the mill from running, and that things should remain just as they were, the property in our use ; that when we wished to run, why run, and do all we could with it ; that Mr. Barent Staats would write to his brother, the plaintiff, in Oswego, New York, and an arrangement would be made, he presumed, to settle matters between the parties ; that neither of them wished to close up the concern, but to secure themselves.

I am acquainted with the value of machinery of this kind, and have been engaged about it eleven years. I should consider the engine and boiler and fixtures worth two thousand dollars, and cheap at that, at the time Funk took possession. We then thought it would need new following bolts and bolts for setting out springs. Funk, by his agent, Mr. Herbert, had two custodians. Herbert claimed possession under the mortgage for Funk.

The witness, on cross-examination, said, in his estimate of value, he included engine, boilers, pipes, smoke stack, heater and jackets, but not brick work ; under the term appurtenances, should include every thing necessary to run the engine. Value the boilers at ten cents a pound, or $700 each. In estimating the value in the mill, I called it to us $2,500, but estimating it to remove, I call it $2,000 ; the boilers I think worth $700 a piece, the engine $500 or $600. If the boilers were separated and I left one in shop, I should sell one boiler for $800. I should charge that for it. I should think the one boiler and the appurtenances would be worth about $1,800 ; the appurten-

ances about $500, I guess. The original cost of the whole, engine, boilers, etc., was $3,215, besides brick work. I do not know what such property is worth. They have grown four years older. Price of engine, boilers and pipes was $3,000. I have put on two prices—when we pull an engine to pieces and sell it so, we should sell it for more.

We run the engine up to the time Mr. Herbert took possession, most of the time. Baldwin was there every day except about one and a half days, when he was sick; was there the rest of the time. The gibs and keys weighed about one pound. Baldwin used to carry them away when we were not using them.

*Barent Staats,* a witness called on behalf of the plaintiff, testified, that at request of plaintiff he came, March, 1859, from his residence in Milwaukee, to protect the rights of plaintiff in the property described in the mortgage, which, March, 21, 1859, I took from the office of recorder of Cook county, and March 22, 1859, by virtue of mortgage above, I took possession of the mortgaged property, and placed a party there to control it, Mr. Baldwin, whom I placed in possession. About that time I had a conversation with defendant Funk, who came on here about that time. There was some negotiation made by all parties, Temple and Wright, myself, and Mr. Funk. This was a day or two after I took possession. The object was not to break up the concern, and give them a chance to negotiate, and still make good my brother's claim; that was understood between Funk and myself. Funk wanted to take the property to Iowa. I could not consent. Mr. Baldwin was to keep possession. Temple and Wright were to work the mill until a conference could be had between Funk and plaintiff, to see who would sell out to the other. In the course of about twenty days, plaintiff and defendant Funk met at Chicago.

On cross-examination, he testified: Baldwin was employed to keep possession for Staats, not for Funk, till plaintiff and defendant Funk could get together. I wrote my brother; don't remember whether I received an answer from him; thereupon I wrote to Funk.

*Philander H. Baldwin,* for plaintiff, testified: between eight and nine o'clock A. M., March 22nd, 1859, Barent Staats—having plaintiff's mortgage with him at Temple and Wright's office, about twenty or thirty feet from their mill where the property included in mortgage was—employed me to take care of the engine, boiler and fixtures. He went with me to the mill and showed me the engine, and took some keys out of the piston and gave them to me. Without the keys they could not run the engine. Wright was present. He, Staats, told me to take

Funk et al. *v.* Staats.

care of the engine, boiler and fixtures, and the next day he told me to let Temple and Wright run the mill, if they wished, letting them have the keys, and then take them out. I was to continue until further orders, and I continued in possession about twenty days, from seven to twelve and from one to six o'clock, except one and one-half days I was sick, and during this time, the engine was run three-fourths of the time. When they run the engine I was there, and gave them the keys, and when they were done, I put them in my pocket.

Second day, the next after Staats employed me, I saw Funk, and was introduced to him. Funk had a custodian to look after his property during the twenty days I was there, one Adams. Neither Adams nor Funk interfered with me. On or about April 13th, Herbert told me I was not wanted any longer there, and that he had a lease of the premises for Funk, whom I understood he acted for. He insisted that I should go, and said he should put me out, and I went out. After this, Mr. Staats was there. I don't know the name of the man that went up there. Staats, the plaintiff, undertook to get in, but defendant, Funk's people, directed by Herbert, would not let him in. They (defendants' people) had about twenty police officers there.

On cross-examination, Baldwin testified, that the keys he took out of the engine were pieces of steel, one piece about two and one half inches long, and one piece five inches long.

*David S. McLane* testified, for plaintiff: Received a chattel mortgage from plaintiff, and with five men undertook to get possession of the property mortgaged in Temple and Wright's mill. Funk's keepers told me I could not have it; I demanded it of them. Herbert came up; asked if I had any paper. He said if I had a writ of replevin, I could have it. I said I had not. Herbert said I could not have it. I waited, at request of men in mill, for Herbert to come. Herbert came with police.

Cross-examined. I pretended to be an officer. I said I was a constable. I was there as a constable to arrest any one who made a disturbance. I had a chattel mortgage to execute. I said I had no precept. My orders were to break into the building if I could not get in peaceably, from the plaintiff, not from the attorneys, but this young man, in the office of Goodrich, Farwell and Smith, said Mr. Goodrich wanted to see me.

*William W. Farwell* testified, for plaintiff: About 19th or 20th of April last, some question having arisen between Herbert and myself, I desired to know of Mr. Funk, whom I went to see at Herbert's suggestion, whether what Mr. Herbert had done about the property mortgaged to Staats, by Temple and Wright, had been done with his consent and under his authority. Funk replied, that what Herbert had done was by his authority and

by his approval.   Herbert was present, and remarked, after my statement of the case, we do not want you to understand that we admit that Staats was in possession.

Cross-examined.   Once, when you called, something was said in our office about taking forcible possession of the property.   I presume that Herbert sent for Funk to come here.

*George W. Hall* testified, for plaintiff:  Reside in Sterling, Illinois.   Am acquainted with all the parties — Temple, Wright, John Staats, and Barent Staats.   In the spring of 1857, Temple and Wright asked me to take some part in execution of note and mortgage for Staats.   The day of the transaction, Temple, I think, called on me at my place, one or both of them having spoken to me before, and requested me to go to their office, and I went.   Temple then handed me a power of attorney from plaintiff, which is in my possession among my papers at Sterling, I suppose.   Temple said, Staats had sent it.   Temple and Wright proposed to secure the debt they owed Staats by chattel mortgage.   The mortgage (above copied) now shown me, was then produced, ready drawn up, and was read, and Temple and Wright signed it, and I witnessed it.   A note, also made before, accompanied the mortgage.   This was the end of the transaction, except sending the note to Staats and recording the mortgage.   They said, I think, that the mortgage should be acknowledged and recorded.   I left the mortgage with them to be acknowledged and recorded.   Mr. Temple said he should be writing plaintiff, and would enclose the note to him.

Mr. Temple was sitting at his desk when the business was done.   I was sitting near by his side.   Mr. Wright was present during the whole transaction, but I am not certain whether he was sitting or standing by the desk.   We arranged about the acknowledgment of the mortgage, and that was the end of it. I examined the note and mortgage, either before or after the signing.   My impression is, that Temple signed the company name to the note.   I saw Temple and Wright sign the mortgage. The note and mortgage were on the desk before me.   The note was signed at that time, after I got there.

Cross-examined.   I never corresponded with Staats, or have done any other business for him in the West.   Saw him last, two years ago this summer or fall at Chicago.   Wright spoke to me a few days, I should judge a week, previous to signing the mortgage and note, about securing Staats, I think at his house, and at that time spoke of a claim of Foss and others, for the infringement of a patent, and said he should not pay it until he had paid his honest debts, or something to that effect.   He said, I think, Staats had furnished them with lumber and favored them with credit, and he ought to be secured or paid before

Foss. I had several conversations with Wright about securing his creditors about that time. Wright named other debts, one particularly. I cannot say that Mr. Temple or Mr. Wright gave me any other reason for preferring any of their creditors, than that stated above, between the date of this conversation and the time the mortgage was signed; I think they did not. I do not remember that I objected to the length of time on which the mortgage was given, at the time it was signed. I think one or both of them said the time given would be acceptable to plaintiff, but I do not know that anything was said on the subject. I had not received any other letter or paper from the plaintiff but this power of attorney, and none other was exhibited. I took that. I supposed it belonged to me. The reason why I did not take the note and mortgage was, I had implicit confidence in Temple and Wright. No other papers were exhibited there but the note and mortgage. I was on intimate and friendly terms with Temple and Wright. They said at that time that they had written to plaintiff, and had received the power of attorney.

Re-examination by plaintiff's counsel. Witness stated, that Wright spoke of a debt due Funk, when he spoke of preferring his creditors. When I met plaintiff in Chicago, I had no conversation with him in reference to the transaction about taking security for the debt. I was busy in the mill, and my attention could not be diverted.

The plaintiff here introduced the note as follows :

$2,077.44. *Chicago, March 21st,* 1857.

On the twenty-first day of March, eighteen hundred and fifty-nine, we promise to pay to the order of John Staats two thousand and seventy-seven dollars and forty-four cents, with interest at the rate of seven per cent. per annum.

Exhibit B. }
J. HOWLAND THOMPSON. }

The defendants then introduced their evidence as follows:

Chattel mortgage of the property in question, with other property, from John F. Temple and Robert M. Wright to Henry Funk, dated October 14th, 1858, acknowledged before J. A. Hoisington, justice of the peace, January 25, 1859, by John F. Temple, and the same date before C. H. Barmm, justice of the peace, by said Wright, recorded January 29, 1859. This mortgage contained the usual provision that the property should remain in possession of the mortgagor, and provided further, "that if default in payment as aforesaid on said October 14, 1859, shall be made, or the said Henry Funk shall at any time feel unsafe and insecure, that then the said Henry Funk, or his attorney, agent or assigns, or heirs, executors or administrators, shall have the right to take possession of said goods and chattels, wherever the same may or can be found, and sell the same,"

etc. ; and was given to secure payment of a note from Temple and Wright for $1,135.36, payable to the order of Henry Funk, in one year after date. Dated, Chicago, 14th October, 1858.

The defendants also offered in evidence a lease of Seth Wadams, to John F. Temple and Michael H. Wright, dated February 2, 1855, of the lots on which the Temple and Wright mill and office stand, and the assignment of M. H. Wright to John F. Temple; and a lease from John F. Temple to Henry Funk, defendant, dated March 22nd, 1859, of same premises.

*John F. Temple,* a witness introduced for the defendants, testified as follows :

I reside in South Chicago ; resided there when the plaintiff's mortgage was executed and acknowledged. It was made with two others to secure *bona fide* debts to cut off a heavy judgment against one of the members of our firm for an infringement of a patent right which we considered unjust, on which an execution was about to issue in the United States Circuit Court for the Northern District of Illinois. The debt to plaintiff was due when the mortgage was given. Either Wright or myself wrote to the plaintiff. Do n't remember whether we received a letter from plaintiff in reply. Plaintiff afterwards, some months, in 1857, was here, and complained that his mortgage did not have priority. We gave these mortgages to secure these *bona fide* debts, in preference to a claim against one of the firm. These mortgages had a direct reference to this judgment. Our intention was to evade the payment of this judgment by these mortgages. By them our intention was to hinder and delay our creditors, which was its natural result. We put off the mortgage two years, to get all the time we could get to pay under that instrument. We had our own choice. At this time only about $600 of Funk's (defendant's) debt was due.

The judgment aforesaid was against Alpheus Stewart, Michael H. Wright, and Robert M. Wright. The two Wrights and I were partners when the judgment was rendered, and the name of the firm was A. Stewart & Co., and at the time of the infringement also, we three were the partners in the firm of A. Stewart & Co., and were using the patent.

In respect to this judgment, we thought that our property was not enough to cover the judgment and all our other debts ; that it would take all our property, or nearly so, to pay the judgment. We had the motive to execute the mortgage to prevent the judgment being levied ; to avoid the one by accomplishing the other ; we had a two-fold motive. The note secured by the mortgage was never delivered to plaintiff, (the note produced and identified by witness.) It has been in my office up to a day or two ago. No receipts or papers were given up

41

when the plaintiff's mortgage was made. The debt to plaintiff secured by the mortgage has never been paid.

I was present at Herbert's office ; a conversation was had between Barent Staats and Funk about the respective claims on the property generally. Both professed a disposition to be easy with us. A proposition was made to have the mortgages renewed, and both parties come in *pro rata*, but not accepted. Barent Staats was in a hurry to get home, and when rising to leave, said he would write to his brother, and agreed that neither should take any legal steps to secure their claims without notice to the other, and that some time, I think ten days, was given Staats to get an answer from his brother ; then he left. This was about the twenty-second of March, 22nd or 23rd. I did not hear anything said about taking the property to Iowa. This conversation was after Staats had taken possession of the engine, etc.

I was present when Herbert took possession for defendant Funk, April 11, 1859. The property mortgaged to Staats was then in our possession. I judge, no one interfered with me. I was in the office. Mr. Wright and Adams were in mill between five or six o'clock, P. M. The mill had been running about three-fourths of the time since Mr. Staats took possession. There were no indications that any one but us were in possession, or that Staats was in possession. The business went on the same as before. Baldwin was in and out, and one time was absent from Friday noon, and did not return till Monday evening. About this key that Baldwin had, we could make one in five minutes with a jack knife, out of hard wood. Outsiders could not tell anything about the key.

After Herbert for Funk took possession, I never saw Baldwin there again. This absence was after Baldwin had been there three weeks or more.

On cross-examination, the witness testified : I am brother of defendant Funk. The two mortgages spoken of, given at the same time with plaintiff's mortgages, one of them was to defendant Funk for a debt included in his new mortgage of October 14th, 1858, to amount of $586, and some cents. The balance of the second mortgage to Funk was money borrowed for the firm, some time in 1857, May or June, I think. The note to Staats is in Sidney Smith's handwriting. I tore off the signature sometime last winter ; had lost the note and thought it was rather exposed and tore them off. No one was by ; do n't know whether it was before or after the last mortgage to Funk was recorded. I had no instructions to do it ; advised with my attorney, Mr. Herbert. Do n't think Herbert told me to tear the signatures off, but that the note was worthless. Before this note fell due, plaintiff did not ask for it. The instructions to

Funk's man, Adams, were to see that nothing was carried away. Neither party knew that the other had placed a custodian there. Adams was put in by Funk the next morning after Staats told him he had put Baldwin in. Funk was here four or five days in all, and went to the mill occasionally. He came there by request. Funk and Staats wished to show that they were friendly to us; did not wish to break us up, if they could help it.

John F. Temple re-examined by defendant's counsel: Was present at the time testified to by witness Hall, when note and mortgage were signed. Neither were delivered or given to Hall. The mortgage was read to Hall. Wright went to get Hall to come to the office. I had conversation with Hall within a week before this, and stated to him the object to be to evade payment of the judgment. About this time our firm had written to plaintiff to employ Hall to act for him. I stated to him that the judgment was unjust, and I wished to execute the three mortgages to plaintiff and defendant, and to another person, to evade its payment. The making these mortgages was voluntary on our part, and were given to secure money we owed. About everything was covered by the three mortgages to plaintiff, Funk, defendant, and Adam Funk. ·

There is a large mass of other testimony in the record, relating principally to the value of the property, but it is believed that the foregoing comprises all which is necessary to a full understanding of the case.

The defendants, by their counsel, then moved the court to exclude that part of the testimony of Barent Staats, John F. Temple and Robert M. Wright, which goes to show any agreement or understanding between the plaintiff and defendant, offered for the purpose of explaining the possession of Temple and Wright, and the want of exclusive possession on the part of the plaintiff of the property, covered by plaintiff's mortgage, from the 22nd of March to the 12th of April, as being inadmissible for that or any other purpose; but the court overruled the motion, and defendants excepted.

G. HERBERT, for Appellants.

FARWELL & SMITH, for Appellee.

WALKER, J. There are various questions presented for determination by this record, the first of which is, whether it was necessary to show that the mortgage had been acknowledged by each of the mortgagors, before a justice of the peace, in the precinct in which he resided. It appears to be conceded that Wright resided in West Chicago, and that the instrument was

acknowledged before a justice of the peace of that division, and the property to be affected by it was situated, and the business of the firm was carried on in that precinct, but Temple, the other partner, resided in a different district. Was this a sufficient compliance with the law regulating such instruments ? The act provides that the mortgagor " may acknowledge such mortgage before any justice of the peace in the justice's district in which he may reside." The act also requires the justice to make a memorandum of the mortgage, and enter a list of the property mortgaged, upon his docket.

From these provisions it is manifest that the object, in requiring the acknowledgment, and the entry of the memorandum, in the justice's district in which the mortgagor resided, was to give notice to creditors and purchasers. It being usual for the owner of chattels to have them at his place of residence or business, a compliance with these provisions would usually afford those wishing to purchase the property, a ready and easy means of acquiring information as to its situation, without resorting to the records at the county seat. It would therefore seem, that when the several partners or joint owners have acknowledged such a mortgage in the justice's district in which one of them resides, and in which the property is situated and used, the object of the statute is fully answered. Otherwise, no matter how numerous the joint owners, or how different their residences, whether in the same precinct, county, State or country, they would have to acknowledge the instrument before the officer, and have the memorandum made on his docket, in the precinct of their several residences, in many cases hundreds of miles distant from the property. What possible object could the legislature have had, in requiring a resident of Massachusetts, who was a joint owner of property in Illinois, to make the acknowledgment in the justice's district of his residence. Such could not have been their object. But when the property is situated in a district different from that of either of the joint owners, it may be different.

It is also urged, that the evidence failed to show that the justice of the peace before whom the acknowledgment was had, made any entry of the fact, or made any memorandum of the property embraced in the instrument on his docket. The record fails to show that any objection was made to reading it in evidence on that ground. Other objections were urged at the time, and the party cannot now be heard for the first time to raise that question. To entitle it to consideration in this court, the question should have been raised on the trial below, and thus have afforded the opposite party an opportunity to obviate the objection.

It is urged that the evidence shows, that appellee's mortgage

was executed to hinder and delay creditors. Hall testifies, that the mortgagors informed him that Foss was on the eve of obtaining a large judgment against one of the members of the firm, and that their means would not be sufficient to pay their creditors and satisfy that judgment, and that they wished to prefer the payment of appellee's debt, to this judgment when obtained. Temple, in his letter to appellee, assigns the same reason for proposing to give the mortgage. It is true, that he afterwards, in his testimony, says that it, with the other mortgages then given, were designed to hinder and delay their creditors, and that he so informed Hall, appellee's agent. We think the court below was justified in giving credence to the evidence of Hall, rather than to that of Temple. If the design of appellee was to secure his debt, and not to aid the mortgagors in hindering or delaying their creditors, there is no legal objection to the transaction. A debtor has a right to prefer creditors in payment or security, if the parties act in good faith. And the evidence in this case warrants the conclusion, that appellee's only object was to secure his debt, and if that was the case, the motives governing the mortgagors could not affect the transaction, so long as he had no participation in it.

The next question arising on this record, is, whether the appellee reduced this property to possession, on the default in the payment of the debt, so as to retain his lien. Appellants' mortgage was subsequent in date to that of appellee's, which appears to have been properly recorded, and the appellants, therefore, had constructive notice of its existence, when their was executed. There can then be no question that they took their lien subject to that of the appellee's. And unless appellee postponed his lien to that of appellants', by delay in reducing the property to possession, after the default in payment, it remains a prior lien. It has been uniformly held, that to permit the mortgaged property to remain·in the possession of the mortgagor, contrary to the terms of the deed, is fraudulent *per se*, and is incapable of explanation. But whether the possession does so remain with the mortgagor, is a question of fact, which must be determined from the evidence. And it has been held, that after the property has been reduced to possession on default, and the title has become absolute in the mortgagee, he may then loan it to the mortgagor, or employ him to use it for the owner's benefit, precisely as he might any other property he may own, and that these facts may be proved by any satisfactory evidence. It is believed that no adjudged case can be found, which holds that a mortgagee, after foreclosure, forfeits the right to such property by loaning it temporarily to the former owner, or by employing him to use it in the ordinary affairs of the owner, any more than he would to thus employ his other property. He

receives it with no taint or infirmity growing out of the former existence of the mortgage. It all depends upon the good faith of the transaction after the foreclosure, of which the jury must judge from all the circumstances appearing in evidence, as well from the former relations of the parties, as their present condition.

In determining whether the property in this case was, in good faith, reduced to possession by the mortgagee, the court had the right to consider all the circumstances attending the transaction. And a sufficient delivery and possession on a sale of chattels, to operate against creditors and purchasers, will be sufficient on a foreclosure of a chattel mortgage. The reason of the rule in the one case, is the same as in the other, and hence a delivery and possession which will sustain the one, will be sufficient in the other. The situation and nature of the property must of course be considered. Articles ponderous and unwieldy are not capable of the same visible signs of ownership, as are those which are light and more portable. What would be a sufficient possession of a steam boiler and engine, owing to their ponderous and unportable nature, would not be of household furniture, farming utensils, merchandise, and other lighter articles, which are susceptible of ready and easy change from the visible custody of one person to that of another. Suppose, in this case, that the appellee had removed the engine and boilers from their fastenings and bed, and placed them in the yard or highway, would any one doubt that it was a sufficient assertion of ownership and possession to have answered the requirements of the law? And yet, after much labor and some expense, the property would still have been apparently in the possession of the mortgagors.

Again, Baldwin, Wright and Ryerson, all state in their testimony, that appellants were informed that appellee had taken possession of the property, before they made any effort for that purpose. But it is urged, that notwithstanding the notice, the acts done by appellee, through his agent, did not constitute a possession of the property. The brother of appellee came, on the 22nd of March, the day after the maturity of the mortgage, went into the mill, and there received possession of the engine and boilers, by a formal delivery, but they were not removed. He, however, at the time, took into his possession the keys and gibs of the engine, without the use of which it could not be started and used, and placed them in the hands of Baldwin, who was then appointed custodian of the property. It was at that time agreed that the mortgagors might run the engine, with permission of Baldwin. The evidence also shows, that until appellants obtained the exclusive possession of the property, it was only used by Baldwin's permission. The keys and gibs

were obtained from him each morning, and returned to him each evening, he remaining on the premises and about the mill during working hours, the whole time, except one day and a half, when he was sick.

This, we think, was a sufficient possession, if *bona fide*, under the mortgage, to fulfill the requirements of the law. It was of the same character as that under which it was held by appellants, except that they had procured an assignment of the lease of the property on which the mill was situated. That circumstance had no tendency to render the possession more visible or notorious, unless the record of deeds had been examined. But either was all the possession which could be taken, without much inconvenience and considerable expense. The property was under the exclusive control of the custodian of appellee, and there is no evidence in the record from which it appears that the mortgagors, or either of them, while Baldwin was there, exercised any control, in person, over this mill or its machinery. The mere fact that the same hands who had operated the machinery under the mortgagors, were still so engaged, was not of itself calculated to mislead the public. They were only operatives, and being in the apparent actual possession, if this *indicia* of ownership was calculated to mislead the public, it would be to induce the belief that they were the owners.

Whilst the evidence is not of that clear and satisfactory character that relieves the mind of all doubt as to the value of the property, we think the preponderance is in favor of the value fixed by the witnesses of appellee. They seem to have had the best opportunities of knowing its condition, and equal means of ascertaining its value, with those of the appellants'. That the court below fixed a value less than that of appellee's witness, is not an error of which appellants have a right to complain. If it was erroneous, it was in their favor, and they have no right to object. On the whole record we perceive no sufficient error to require a reversal, and the judgment of the court below must be affirmed.

*Judgment affirmed.*